UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIM KOUBA<br><br>        Plaintiff,<br><br>        v.<br><br>OMNI HOTELS MANAGEMENT<br>CORPORATION<br><br><br><br>        Defendant. | Civil Action No. 8-cv-2106 (RLW) |

**MEMORANDUM OPINION**

In the instant action, Plaintiff Kim Kouba, who is a lesbian, challenges her termination from employment by Defendant Omni Hotels. Kouba brings this claim pursuant to the District of Columbia Human Rights Act, which prohibits discrimination based on, *inter alia*, gender and sexual orientation. *See* D.C. Code § 2-1402.11(a)(1) (2001). Jurisdiction is based upon diversity of the parties.<sup>1</sup> (Minute order Jan. 8, 2009; *see* Doc. 8.)

Presently before the Court is Omni's motion for summary judgment. (Doc. 18.) For the reasons explained below, Omni's motion shall be granted.

---

<sup>1</sup> In addition to her Human Rights Act claims, Kouba originally asserted claims pursuant to the D.C. Payment and Collection of Wages Act, D.C. Code § 32-1303. However, on August 27, 2009, Kouba voluntarily dismissed her Section 32-1303 claims. (*See* Doc. 17.)

1

# FACTS [2]

Omni hired Kouba as Director of Finance for its Washington, D.C. location in September, 2007. [3] As finance director, Kouba was a member of the executive committee, which includes the top leaders and directors of the hotel. Kouba was responsible for supervising all financial operations at the hotel. Accordingly, Kouba was privy to employee salary information and she was responsible for maintaining such information in confidence. (Kouba Dep. at. 62-63, 65, 69.) Her efforts to do so included keeping salary and other financial information under lock and key, as well as password protecting financial computer data. (*Id*. at 65 - 66.) Additionally, when providing budgets to mid-level managers (i.e, non-executive committee members), Kouba was instructed to block out managers' salary information, so as not to disclose such information outside each department. (Kouba Dep. at 76.)

As Director of Finance, Kouba reported directly to hotel manager Tracy DiFulgo, who gave Kouba a good performance evaluation in May 2008. Not only did her evaluation show Kouba met or exceeded expectations, but with respect to her ability to maintain confidences,

---

[2] Kouba offers several objections to the declaration of Joy Rothschild, Vice President of Human Resources, upon which Omni relies in part. (*See* Pl's Response to Def.'s Undisputed Facts at p. 4-5.) Omni responded to Kouba's objections by attaching to its reply brief a "corrected" declaration from Rothschild. (*See* Doc. 25, Ex. C.) Kouba then filed a sur-reply brief renewing some of her objections. (*See* Doc. 26.) Because the Court did not need to consider Rothschild's Declaration in reaching its decision on Omni's motion, the Court declines to reach the issues raised by the parties with respect to the Rothschild declarations.

[3] The witnesses use the titles "Director of Finance" and "Controller" interchangeably. (Combs Dep. at 10-11.)

DiFulgo noted Kouba exhibited "extremely high integrity and trust." (Pl.'s Ex. 8.) On June 16, 2008, Ann Peterson became the Omni General Manager, but Kouba continued to report directly to DiFulgo.

Omni terminated Kouba several months later, on or around September 5, 2008, after an investigation into a sexual harassment complaint revealed that Kouba had disclosed confidential salary information about two Omni hotel employees to a third employee, Jaclyn Stone. (*See* Pl.'s Ex. 7.) Stone was an Omni employee who was temporarily working at the D.C. Omni as a "task force member" under the direct supervision of Kouba. (Kouba Dep. at pp. 105-6.)

Although hotel manager DiFulgo had previously explained to Kouba that General Manager Peterson did not care for managers going out and drinking with subordinate employees, Kouba was not told to refrain from doing so. (Kouba Dep. at 89, 204-5.) On August 21, 2008, Stone and Kouba went to an offsite bar where the two had drinks and exchanged text messages.[4] (Doc. 24, Pl's Response to Def.'s Undisputed Facts at p. 10; Pl.'s Ex. 3, Kouba Decl. ¶ 7.) Kouba testified she was not interested in Stone romantically, but instead Kouba claimed that she was considering hiring Stone to help solve some finance department problems that had surfaced during a prior audit. (Kouba Dep. at 110, 196.) According to Stone, she had no interest in a position at the Washington location; rather Kouba kept "pushing" the idea on Stone. (Stone Decl. ¶ 8.) During a text message exchange about the salary Stone would seek if she sought a

---

[4] Defendant indicates in its brief that the incident occurred in August 2009 and Kouba agrees this fact is undisputed. (*See* Def.'s Statement of Facts # 15; Pl's Response to Def.'s Undisputed Facts at p. 10.) Because Kouba's termination letter is dated September 2008, it appears the relevant interactions between Kouba and Stone occurred in 2008. (*See* Pl.'s Ex. 7.)

position, Kouba admittedly disclosed the salaries of two employees: credit manager Jackie Picket and Assistant Director of Finance Lauren Burke:

> Why that number out of curiosity? But yes . . . Jackie at [redacted ] . . . underpaid as well. Lauren at [redacted].

(Doc. 18, Def.'s Ex. I, DEF000373, Pl's Response to Def.'s Undisputed Facts at p. 11.)

During the course of the week after the disclosure, Kouba and Stone socialized approximately four additional times outside of work. (Kouba Dep. at 106.) In the aftermath of these interactions, Stone contacted Human Resources and reported that Kouba's conduct made Stone uncomfortable. (Stone Decl. ¶¶ 9-10.)

As a result of Stone's complaint, Vice President of Human Resources Henry Tebbe contacted Kouba, who was attending an out-of-town conference, and questioned her about Stone's sexual harassment allegations. (*See* Kouba Dep. at 158.) At some point, Tebbe asked Kouba if she had disclosed salary information to Stone. Kouba first said she had not, but later remembered she had done so. (Kouba Dep. at 160 - 61.) Kouba also told Tebbe that the disclosure was a mistake because she ultimately realized Stone was not serious about pursuing a position with the D.C. Omni location. (Kouba Dep. at 161, 204.) When Tebbe shared the results of the investigation (which were inconclusive) with Peterson, she found out about the salary disclosures and ultimately decided to terminate Kouba. (Peterson Dep. at 42, 55.)

Around this same time, on Labor Day Sunday, August 31, 2008, Kouba returned from her conference and attempted to gain access to her office, but found the locks had been changed.

4

Kouba contacted Peterson and DiFulgo asking if they could "please explain how I may obtain access to my office as it appears that my office door lock has been changed." (Pl.'s Ex. 6.) In response, Peterson admonished Kouba to "Please check the tone of your email I will see you tues you can get in then." (*Id*.) When asked what her email meant, Peterson testified "my interpretation was that I was being challenged as to why the office door wasn't working." (Peterson Dep. at 66.) When asked if she found the Kouba email offensive, Peterson testified "At the time I was. . . . I was disappointed that somebody that was in her role, somebody that I needed to trust had shared information that shouldn't have been shared and now was gaining access to an office on a three-day weekend when they really had no expectations of being there." (Peterson Dep. at 65-66.) According to Peterson, Kouba was not scheduled to return to the office until the following Tuesday after Labor Day. (*Id*. at 66.)

In reaching her decision to terminate Kouba, Peterson did not confer with DiFulgo, Kouba's immediate supervisor. (Peterson Dep. at 42-44.) Peterson testified that she does not recall whether or not DiFulgo was in D.C. when these events occurred, but Peterson does remember that DiFulgo was either dealing with the burning down of her house or the death of her mother around that time. (Peterson Dep. at 43-44.) Although DiFulgo could have been reached, Peterson testified that she did not want to contact DiFulgo because of her personal situation and because Peterson wanted to have as few persons as possible involved in the investigation, so as not to damage anybody's reputation if the allegations proved to be false. (Peterson Dep. at 43-44.)

Peterson did, however, confer with Human Resources Director Combs. (Peterson Dep. at

42-44; Combs Dep. at 7–8.) It is not clear if Peterson had reached a decision on the matter at the time of the discussion with Combs. Once she reached a decision, however, Peterson admits she shared her decision with Vice-President of Finance Rick LaValley, Senior Vice President of Associate Services Joy Rothschild, as well as Regional Vice President Ed Netzhammer, all of whom agreed with Peterson's decision to terminate Kouba. (Peterson Dep. at 51-53, 56.)

According to Human Resources Director Combs, termination of executive committee members, such as Kouba, require corporate approval. (Combs Dep. at 8.) Although Peterson admittedly made the termination decision, she testified she was of the opinion she should obtain corporate "advice or counsel" from the executives prior to implementation of her decision. (Peterson Dep. at 53, 56.) According to Peterson, she was new to the job and did not yet know company protocol. (*Id*. at 53.) Therefore, she wanted to make sure the executives understood her decision and they had an opportunity to give her "feedback." (*Id.* at 53- 55, 56.) Peterson testified the executives did not "tell her what do," about the matter and she does not know what might have happened had the executives disagreed with her decision to terminate. (*Id*. at 56.)

Although progressive discipline was an option, Peterson made the termination decision because Kouba had shared confidential information. (Peterson Dep. at 51-52, 54-59; *see* Pl.'s Ex. 7.)

> "[I]n the course of the investigation I found out that confidential information had been shared, to include the salaries of . . . an assistant controller and a credit manager, with someone who was subordinate to the assistant controller, that the sharing of the information occurred in a bar with alcohol and that it was for a position that didn't exist and that my concern is in this position if I can't trust the controller, I can't trust anybody.

6

(Peterson Dep. at 73; *see id*. at 59.) When asked why she elected to forego progressive discipline in favor of termination, Peterson testified that she did not consider Kouba's situation a performance issue. (Peterson Dep. at 58-59.) Rather, according to Peterson, it was a "confidentiality and trust issue." (*Id*. at 59.)

On Friday, September 5, 2008, Peterson sent Kouba a letter terminating her employment for sharing management team member salaries, in violation of Omni's Confidentiality Agreement. (Pl's Response to Def.'s Undisputed Facts at p. 18.) Peterson replaced Kouba with a male who found out about the job through one of Peterson's contacts.

During her employment with Omni, Kouba acknowledged receipt of the Omni Associate Handbook, which contains the following provisions:

> While every situation cannot be anticipated, the following are examples of conduct that cannot be permitted and which may result in immediate discharge and/or progressive disciplinary action. . . . [T]he hotel at all times reserves the right to discipline or to terminate any associates as it sees fit in the exercise of its sole discretion.
>
> . . . .
>
> [T]he following acts of misconduct are provided as nonexclusive examples of unacceptable activity:
>
> . . . .
>
> Unauthorized release or use of confidential associate, guest or company information.
>
> . . . .
>
> Any associate who acts in a manner inconsistent with our standards of behavior is subject to discipline, up to and including termination. Responsibility for imposing proper discipline rests in the first instance with an associate's supervisor, but situations involving serious discipline or termination will ordinarily be reviewed by senior management as well.

> In a situation where Omni Hotels believes that the problems with an associate's performance may be cured in a reasonable time, we may choose to place the associate on probation, giving him/her notice of deficiencies in performance and an opportunity to correct them.
>
> <u>Omni Hotels may terminate an associate immediately for serious misconduct, including but not limited to . . . .any other conduct that significantly interferes with the efficient operation of Omni Hotels</u>.

(Def.'s Ex. A at DEF000260 - 61; DEF000264) (emphasis added).

In addition to the rules of conduct and disciplinary policies spelled out in the handbook, Omni maintains certain confidentiality policies. Consistent with those policies, Kouba signed a Confidentiality Agreement which contained the following provisions:

> 2. Employee hereby agrees that Confidential Information (a) will be held in confidence and not disclosed by Employee to any person and (b) will only by used by Employee in connection with his or her job duties while employed by Omni.
>
> . . . .
>
> 4. <u>Employee understands and acknowledges that any violation of the terms of this Agreement may lead to the termination of Employee's employment with Omni</u>.
>
> 5. <u>Nothing in this Agreement is intended to prohibit employees from discussing with one another, or with third parties who are not competitors of Omni, wages, hours and other terms and conditions of employment</u>.
>
> 6. This Agreement shall constitute the entire agreement between the parties with regard to the subject matter hereof. No modification, amendment or waiver shall be binding without the written consent of each of the parties.

(Def.'s Ex. E ) (emphasis added).

Kouba never agreed to any modifications of this confidentiality agreement and she testified that she believed the agreement allowed her to discuss salaries with individuals who were not competitors of Omni. (Kouba Dep. at 197.) Kouba admits, however, that she could have given Stone a salary range, rather than disclosing employee salaries. (Kouba Dep. at 171.)

Kouba admits she is not aware of any executive committee members who shared salary information with subordinate employees. (Pl's Response to Def.'s Undisputed Facts at p. 19.) Additionally, Kouba has no evidence of anyone at Omni making disparaging comments about women, gays or lesbians. (*Id*. at p. 20.)

## LEGAL STANDARDS

**A.     Motions for Summary Judgment**

The party seeking summary judgment bears the initial burden of demonstrating no genuine issues of material fact exist. *See* Fed. R. Civ. P. 56.

> In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id*. at 252, 106 S.Ct. 2505. . . .
>
>     [T]he nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

*Felton v. Haris Design & Const. Co.,* 417 F. Supp. 2d 17, 20- 21 (D.D.C. 2006).

**B.     Discrimination Claims**

Because the District of Columbia Human Rights Act (DCHRA) was "'modeled on Title VII,' courts employ the Title VII prima facie case analysis established in McDonnell Douglas' when analyzing motions for summary judgment in cases brought under the DCHRA." *Gaujacq v. Electricite de France Int.'l. North America, Inc.*, 572 F. Supp. 2d 79, 87 n.5 (D.D.C. 2008) (quoting *Goos v. National Ass'n of Realtors*, 715 F. Supp. 2d, 3 (D.D.C. 1989); *Howard Univ. v. Green*, 652 A.2d 41, 49 n.3 (D.C. 1994)). Therefore, this Court must apply a Title VII analysis when reviewing Omni's summary judgment motion.

> In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision . . . the district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin? [5]
>
> . . . .
>
> A plaintiff . . . may try in multiple ways to show that the employer's stated reason for the employment action was not the actual reason (in other words, was a pretext). Often, the employee attempts to produce evidence suggesting that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances. Alternatively, the employee may attempt to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision. . . . .

---

[5] Although Title VII does not protect against discrimination based on sexual orientation, the Title VII analysis still applies when interpreting the DCHRA's protections against discrimination based on sexual orientation. *See Howard Univ. v. Green*, 652 A. 2d 41, 45 n. 3 (D.C. 1994).

> Employees often try to cast doubt on an employer's asserted reason in other ways as well, such as pointing to: changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker.

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494, 495 n.3 (D.C. Cir. 2008) (citations omitted).

## ANALYSIS

Kouba argues Omni's stated reason for her termination, disclosure of confidential salary information, is a pretext for discrimination because this policy specifically allows for disclosure of such information to non-competitors. (*See* Def.'s Ex. E #5.) Further, she argues additional evidence of discriminatory intent can be found in: (1) Peterson's failure to impose a lesser penalty; (2) Peterson's failure to consult Kouba's immediate supervisor DiFulgo, who was gay; (3) Peterson's "inexplicable" "sharp words" directed at Kouba over the email regarding entry to her office; and (4) Peterson's "demonstrated" and "irrational dislike" of Kouba.

Kouba's arguments are not persuasive. Kouba cites the written policy which allows employees to disclose "wages, hours and other terms and conditions of employment" with "one another, or with third parties who are not competitors of Omni." (Def.'s Ex. E) Although Kouba may have interpreted the policy as permitting the salary disclosures she made, Peterson testified that she viewed the disclosures as a violation of the confidentiality policy. (Peterson Dep. at 51–52, 54-59.) When an employer offers a legitimate non-discriminatory reason for terminating an employee, it is enough that the employer "honestly and reasonably" believed in

11

its justification for terminating the plaintiff. *See Brady v. Office of Sergeeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).

"Of course, the fact that a proffered reason is objectively false <u>may</u> undermine an employer's professed honest belief in that reason." *George*, 407 F.3d at 415. In the instant case, however, there is no evidence that the proffered reason was objectively false. Indeed, the most reasonable interpretation of Omni's confidentiality provision is that it allows an employee to share only <u>her own</u> salary information with others: "to the extent an employee is privy to confidential information about another employee . . . [s]he has no right to disclose that information contrary to the policy of [her] employer." *Community Hospitals of Central California v. NLRB*, 335 F.3d 1079, 1089 (D.C. Cir. 2003) (citing *Aroostook County Reg'l Ophthalmology Ctr. v. NLRB*, 81 F.3d 209, 213 (D.C. Cir. 1996)). *See also*, *Labor and Employment Law*, Ch.4, § 4.04[4][b] (Matthew Bender 2011) (while employees generally have a right under the National Labor Relations Act to discuss their own wages with others and to seek out information about wages from others in order to use such information for self-organization, where "disclosure of the information is a breach of the employer's trust," the conduct is not protected); *International Business Machines Corp.*, 265 NLRB 638 (1982) (while employer may not prohibit employees from discussing their own wages under the NLRA, employer may lawfully terminate employee who disseminated confidential documents related to wages of other employees, where employee was aware of company policy against such disclosure).

Kouba's reliance on *Davis v. Ashcroft*, 355 F. Supp. 2d 330 (D.D.C. 2005), is therefore misplaced. In *Davis*, which involved claims of racial discrimination, the FBI sent plaintiff a letter

ordering her to submit to a psychological fitness-for-duty (FFD) examination and, in that letter, cited to the federal regulation supporting its request. *Id*. at 349-50. The regulation, however, allowed the FBI to request an FFD only <u>after</u> a general medical examination failed to explain employee behavior that might affect safety and performance. *Id*. at 350. Because no medical examination report had been released to the FBI at the time of the FFD request, the Court denied summary judgment for the FBI. *Id*. The Court reasoned that a fact finder could infer discriminatory intent from the FBI's failure to adhere to its own regulations. *Id*. at 350. In the instant case, however, Omni's actions were consistent with company policy, thereby distinguishing the instant case from *Davis*.

Even if a reasonable person could find that Peterson's actions were in technical violation of Omni's confidentiality policy when she terminated Kouba, no reasonable person could find evidence of pretext in Peterson's application of Omni's policy. Indeed, Kouba's own testimony establishes that Omni's practice was to allow disclosures of manager salaries only as absolutely necessary. For example, Kouba admitted that she kept salary information in locked files and, at the direction of her superiors, she redacted certain salary information when sharing budgets among middle managers. (Kouba Dep. at 65-66, 76.) Thus, any allegation that Peterson acted in conflict with the written policy is insufficient to provide evidence of discriminatory motive, because Peterson's actions were consistent with Omni's past practice. When "departure from the prescribed procedure . . . become(s) the norm," such a departure alone does not provide evidence of pretext. *See Fischbach v. District of Columbia Dept. of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996).

Accordingly, Kouba's challenge to Peterson's decision is without merit, unless she has evidence of discriminatory motive. The "evidence" upon which Kouba relies, however, fails to even faintly suggest discriminatory motive. First, Peterson's decision to forego progressive discipline was consistent with the company guidelines. Although progressive discipline is an option for some infractions, the company policies provide that Omni in its "sole discretion" may "immediately" terminate employees for "serious misconduct." (Def.'s Ex. A at pp. DEF000260 - 61; DEF000264.) Peterson exercised that discretion and Kouba points to no similarly situated heterosexuals or males who were treated more favorably. *See Morris v. City of Chillicothe*, 512 F.3d 1013, 1020 (8th Cir. 2008) (finding no evidence of pretext in employer's failure to use progressive discipline where the policy also allowed termination of employees without warning).

Second, no improper motive can be gleaned from Peterson's failure to consult Kouba's immediate supervisor where, as here, there is evidence the supervisor was dealing with family emergencies. DiFulgo's status as a lesbian does not change this analysis. Moreover, Peterson testified she wanted as few persons involved in the matter as possible given the nature of the allegations. There is nothing untoward about Peterson's testimony.

Next, Peterson's "inexplicably" "harsh words" admonishing Kouba to "check the tone of her email," regarding Kouba's locked office, do not establish evidence of discriminatory intent. Peterson explained that she was initially offended by Kouba's email because Peterson believed she could no longer trust Kouba, who was seeking entry to her office, over a holiday weekend, when she was not expected to be in the office. (Peterson Dep. at 65-66.) Additionally, Peterson testified she interpreted Kouba's email as challenging Peterson. (*Id*. at 66.)

14

Finally, Kouba attempts to create pretext by asserting Peterson was biased against gays. According to Kouba, Peterson "demonstrated an irrational dislike of Plaintiff that is difficult to explain and that a reasonable jury could attribute to [sic] except in the context of Plaintiff's status as a lesbian." (Pl.'s Brief at 5.) Kouba supports her argument by citing to the "harsh" email and Peterson's failure to consult Kouba's gay supervisor, DiFulgo, about the termination. As discussed above, there is nothing about these matters that might suggest Peterson was biased against gays.

Kouba also points to certain comments made by Peterson about Kouba's lesbianism, as evidence of bias. Kouba fails to point out, however, that Peterson made the comments in response to direct inquires from Kouba's attorney. Moreover, Kouba's creatively edited recitations of Peterson's comments do not give full context to her testimony.

The Court finds no reasonable jury could find bias in the comments when quoted in context. Specifically, when Peterson was asked when she became aware that Kouba was a lesbian, Peterson testified "[p]robably within the first three days of meeting her." (Peterson Dep. at 91.) When asked how she knew of Kouba's sexual orientation, Peterson responded, "Kim makes it very apparent, discussions socially, in morning meetings. . . . I believe that in the context of morning meetings and overhearing social conversations, that's how I came to gain that understanding." (*Id*. at 91, 94.) When asked if Kouba had the "appearance of a lesbian," Peterson responded "Kim always dressed very professionally when ever I saw her." (*Id*. at 91-92.)

Whether Kouba is of the opinion that Peterson's decision was the most prudent decision,

15

is not the focus of this Court's inquiry. As the D.C. Circuit has explained, "the issue is not the correctness or desirability of the reasons offered, but whether the employer honestly believes in the reasons it offers." *Fischbach v. District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183, 1182 (D.C. Cir. 1996) (citation and internal quotes omitted). Of course, a plaintiff can provide evidence of discriminatory motive in an effort to establish that the proffered reasons are not the real reasons for the challenged employment action. In doing so, however, a plaintiff must come forward with more than speculation and conjecture in order to survive a motion for summary judgment. In the instant case, Kouba has failed to meet this burden and, therefore, her claims cannot survive. *See Carter v. Pena*, 14 F. Supp. 2d 1, 7 (D.D.C. 1997) ("neither the nonmovant's conjecture and surmise nor mere conclusory allegations of discrimination, without more are sufficient to defeat a motion for summary judgment.") (citation and internal quotes omitted).

## CONCLUSION

For the reasons set forth above, the Court finds that no genuine issues of material fact exist with respect to the pertinent circumstances surrounding Kouba's termination and that the evidence, even considered in the light most favorable to Kouba, does not support the allegation

of discrimination. Accordingly, Omni's motion shall be granted and Kouba's claims shall be dismissed.

SO ORDERED.

July 12, 2011

/s/
_____
Robert L. Wilkins
United States District Judge